UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

1st TECHNOLOGY LLC,

Plaintiff,

v.

BODOG ENTERTAINMENT GROUP S.A., a foreign entity; BODOG IP HOLDINGS LTD, a foreign entity; and GK WORLD LINK TELECOM S.A., a foreign entity,

Defendants.

CASE NO. C08-0872-JCC

ORDER

This matter comes before the Court on Plaintiff 1st Technology LLC's Motion for a Preliminary Injunction (Dkt. No. 7), the Response in Opposition[1] by Defendant Data Entry and Domain Management S.A. ("DEDMSA") (formerly Bodog Entertainment Group, S.A., or "BEGSA")[2], Bodog IP Holdings

[1]Defendants argue that, despite the Court's previous ruling on Plaintiff's Motion for Alternative Service (Dkt. No. 26), Plaintiff still has not completed proper service of process, and they appear specially to submit their Response. (Resp. 1 (Dkt. No. 27 at 2).) The Court notes that the day after Defendants filed their Response, Plaintiff filed proof of service on all three Defendants. (Dkt. Nos. 30–32.) The Court also notes that, for the purposes of ruling on a preliminary injunction, the Court must only ensure that notice has been provided to the opposing parties. *See* FED. R. CIV. P. 65(a). Defendants having filed a Response to the motion, the Court is persuaded that, regardless of any service issues that might remain, Defendants received adequate notice for a preliminary injunction to issue.

[2]The Court will refer to Defendant Bodog Entertainment Group S.A. as DEDMSA and BEGSA interchangeably throughout this Order.

Ltd. ("Bodog IP"), and GK Worldlink ("GK World")[3] (Dkt. No. 27), and Plaintiff's Reply (Dkt. No. 33). The Court has carefully considered these papers and their supporting declarations and exhibits and has determined that oral argument is not necessary. The Court hereby GRANTS IN PART and DENIES IN PART the motion and finds and rules as follows.

## I. BACKGROUND

This action arises in the context of ongoing litigation between Plaintiff and Defendant BEGSA in state and federal court. Plaintiff obtained a default judgment in the amount of approximately $46 million against BEGSA, Bodog.net, and Bodog.com in a patent infringement suit[4] in federal district court in Nevada in June 2007. (Mot. 1–3 (Dkt. No. 7 at 5–7).) Two months later, Plaintiff "domesticated the judgment in Washington and sought a writ of execution from the King County Superior Court over the Nevada Bodog Defendants' property in Washington." (*Id*. at 3.) BEGSA owned "approximately 2000 internet domain names registered through eNom, Inc., a registrar located in the state of Washington[.]"[5] (*Id*.) In August 2007, the King County Superior Court granted Plaintiff's motion for a writ of execution

---

[3]Defendants have also submitted a brief entitled "Defendants' Objections to Plaintiff's Evidence in Support of Motion for a Preliminary Injunction." (Dkt. No. 29.) This brief is not properly before the Court as a request to strike material, as any "[r]equests to strike material contained in or attached to submissions of opposing parties shall not be presented in a separate motion to strike, but shall instead be included in the responsive brief[.]" Local Rule W.D. Wash. CR 7(g). Accordingly, the Court will not strike any material in Plaintiff's papers in making its ruling today. However, to the extent that the brief preserves Defendants' objections at trial, the Court will allow the brief to stand. *See* FED. R. CIV. P. 65(a)(2) ("evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial.").

[4]According to Plaintiff's Complaint, Plaintiff's patent is entitled "Method and System for Interactively Transmitting Multimedia Information Over a Network which Requires a Reduced Bandwidth" (U.S. Patent 5,564,001). (Compl. ¶ 10 (Dkt. No. 1).) Plaintiff alleged in the Nevada district court action that BEGSA infringed the patent by operating a "worldwide network of entertainment-related services, such as television and internet video programming, internet gaming, sports and music events." (*Id*. at ¶ 9.)

[5]DEDMSA states that it had approximately 3000 domain names registered in Washington through eNom. (Resp. 4 (Dkt. No. 27 at 5).)

and ordered eNom to transfer control of all of the eNom domain names to Plaintiff and enjoined the Nevada Bodog defendants from using those domain names. (*Id*. at 4.) Thereafter, according to Plaintiff, BEGSA registered additional domain names, such as 'newbodog.com,' with other Washington-based registrars. (*Id*.) According to Plaintiff, BEGSA then "diverted its customers (who would use BEGSA's services through websites accessible via the eNom Domain Names, such as 'bodog.com') to websites accessible through the second set of domain names[.]" (*Id*.)

In response, Plaintiff sought a second writ of execution, this time against the second set of domain names, and requested that the King County Superior Court enjoin BEGSA from diverting traffic from the websites accessible through the second set of domain names to other websites created or operated by BEGSA. (*Id*.) While that motion was pending, Plaintiff alleges, BEGSA registered a third set of domain names through a foreign registrar and diverted traffic again to those new domain names. (*Id*. at 5.)

In response to Plaintiff's motion to appoint a receiver to enforce the Nevada judgment against the Nevada defendants' Washington property, the King County Superior Court judge appointed Mark Northrup of Graham & Dunn. (*Id*.) The judge authorized the receiver to enforce the judgment with respect to the first and second set of domain names by liquidating that property, but not with respect to the trademarks associated with the domain names[6] because the judge was unsure of "the degree to which state courts have jurisdiction to transfer federal trademarks." (*Id*. at 6; Mar. 3, 2008, Hearing Tr. 54:10–12 (Dkt. No. 8-9 at 15).)

BEGSA argued in the King County Superior Court that the domain names would be worthless without the Bodog trademark rights, and therefore, the domain names should not be subject to a writ of execution. (*Id*. at 6.) In addition, according to Plaintiff, BEGSA "purported to transfer its interest in the Marks to GK World[,]" a Costa Rican corporation, allegedly "part of the network of Bodog controlled or managed companies." (*Id*.; Compl. ¶ 3 (Dkt. No. 1 at 2).) Thereafter, "GK World purported to assign the

[6] The trademarks associated with the domain names are "BODOG," "BODOG BATTLE OF THE BANDS," "BODOG GIRLS," and "PLAY HARD." (Mot. 1 (Dkt. No. 7 at 5).)

Marks to Bodog IP[,]" a "corporation organized under the laws of Antigua and Barbuda and . . . part of the network of Bodog controlled or managed companies." (Mot. 7 (Dkt. No. 7 at 11); Compl. ¶ 4 (Dkt. No. 1 at 2).)

Plaintiff filed the instant lawsuit in district court to "set aside the assignment of the Marks as a fraudulent transfer of property because the assignment between BEGSA and GK World as well as the assignment between GK World and Bodog IP was executed after the entry of the Nevada Judgment and after [Plaintiff] initiated the action in King County Superior Court." (*Id.* at 8.) Plaintiff alleges that BEGSA's transfer of its interest in the trademarks to GK World was done for the purpose of defrauding Plaintiff and to frustrate Plaintiff's collections efforts. (*Id.*) Specifically, Plaintiff claims that Defendant BEGSA violated Washington's Fraudulent Transfer Act, Washington Revised Code sections 19.40 *et seq.* (Compl. ¶¶ 32–46 (Dkt. No. 1 at 10–11).) Plaintiff seeks to void the purported assignments of the marks pursuant to 15 U.S.C. § 1119 by having the Court issue an order to the Director of the United States Patent and Trademark Office to make an entry in the register to reflect that BEGSA is the owner of the marks for the purposes of allowing the receiver or Plaintiff to use the marks to satisfy the Nevada judgment. (*Id.* at ¶¶ 47–49.) Plaintiff also seeks a Court order appointing a receiver over the marks, who "in conjunction with the State Court Receiver will dispose of the Marks and maximize the value of the Marks in order to satisfy the judgment in favor of [Plaintiff]." (*Id.* at ¶¶ 50–54.)

In the instant motion, Plaintiff requests that the Court enjoin Defendants from "(1) transferring, assigning, or otherwise disposing of the trademarks, 'BODOG,' 'BODOG BATTLE OF THE BANDS,' 'BODOG GIRLS,' and 'PLAY HARD' . . . ; and (2) utilizing or allowing the use of the Marks in connection with offering illegal gambling services to residents of the State of Washington, pending resolution of this lawsuit." (Mot. 1 (Dkt. No. 7 at 5).)[7]

---

[7]In its Proposed Order, Plaintiff does not limit its second request to enjoining defendants from using the marks in connection with "illegal" gambling services, but rather would enjoin them "from utilizing the Marks in connection with on-line gambling services in the United States, including in the

## II. APPLICABLE STANDARD

The Federal Rules of Civil Procedure authorize the district court to issue a preliminary injunction, after "notice to the adverse party." FED. R. CIV. P. 65(a). According to the Ninth Circuit:

> [a] district court may grant a preliminary injunction under two sets of circumstances. In the first case, "a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." . . . In the second case, "a court may grant the injunction if the plaintiff demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor."

*Guzman v. Shewry*, __ F.3d __, 2008 WL 4307186, at *3 (9th Cir. Sept. 23, 2008) (quoting *Natural Res. Def. Council, Inc. v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008) (emphasis in original)). "[B]efore a preliminary injunction is granted, at 'an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation.'" *Id.* (quoting *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (internal citation omitted)).

## III. ANALYSIS

Plaintiff argues that it has a strong likelihood of success on the merits of its case, i.e., that BEGSA's trademark assignments were made in violation of the Washington Fraudulent Transfer Act. (Mot. 11–13 (Dkt. No. 7 at 15–17).) In addition, Plaintiff argues that it will suffer irreparable harm if the injunctive relief is not granted. (*Id.* at 14–15.) Further, Plaintiff argues that the balance of hardships favors Plaintiff, because Defendants will not suffer any prejudice as a result of complying with the injunction. (*Id.* at 15–16.)

Defendants oppose the motion on grounds that Plaintiff cannot ultimately succeed on the merits of its case. First, Defendants argue that "[f]ederal trademark registrations are not subject to the common law remedies of attachment and execution, and cannot be involuntarily assigned to another party (such as

---

State of Washington." (Proposed Order 2 (Dkt. No. 7-2).)

Plaintiff) without the goodwill and tangible assets those trademarks represent . . . [and] . . . the goodwill of a business cannot be involuntarily transferred." (Resp. 2 (Dkt. No. 27 at 3).) Second, Defendants argue, Plaintiff cannot win on the merits because the Lanham Act prevents "state interference with the ownership of trademarks used in interstate commerce[.]" (*Id*.) In addition, Defendants argue that Plaintiff has "failed to establish that it will be irreparably harmed absent the relief it seeks" and, in fact, that Defendants will be irreparably harmed if the Court issues the injunction. (*Id*.)

The Court will address each of the parties' arguments, in turn, below.

**A. Likelihood of Success on the Merits**

**1. Whether BEGSA Likely Violated Washington's Fraudulent Transfer Act**

Plaintiff argues that it has a substantial chance of success in showing that BEGSA's transfer of the trademarks to GK World constituted a fraudulent transfer of property. (Mot. 11 (Dkt. No. 7 at 15).) The Washington Fraudulent Transfer Act provides two alternate ways of supporting such an allegation, and Plaintiff argues that it can prove both. Under the first method:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With the actual intent to hinder, delay, or defraud any creditor of the debtor[.]

WASH. REV. CODE § 19.40.041(a). Plaintiff argues that BEGSA had actual intent to hinder, delay, or defraud Plaintiff. In determining whether BEGSA had actual intent, the Court may consider, among other things, whether:

> (1) The transfer or obligation was to an insider; . . .
>
> (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; . . . [and]
>
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred[.]

WASH. REV. CODE § 19.40.041(b).

Plaintiff provides evidence that at the time of the execution of the assignment, in December 2007[8], BEGSA and GK World shared at least three officers. (GK World Costa Rican Registration Certificate (Dkt. No. 8-11 at 1–2); BEGSA Costa Rican Registration Certificate (Dkt. No. 8-11 at 3–4).) In addition, Bodog's website, at bodoglife.com, states that GK World is a 100% subsidiary of BEGSA. (Bodoglife.com webpage (Dkt. No. 9-6 at 1).) Further, Plaintiff has put forth evidence that BEGSA's transfer of the marks to GK World occurred six months after the federal district court at Nevada judgment was entered and four months after the King County Superior Court entered its first writ of execution. (June 15, 2007, Notice of Entry of Judgment (Dkt. No. 8-2 at 1); Trademark Assignment Between BEGSA and GK World (Dkt. No. 8-10 at 1).) Moreover, Plaintiff has provided evidence that when BEGSA transferred the marks to GK World, BEGSA was insolvent. BEGSA's accountant stated, in a Declaration filed in the district court in Nevada, that "[a]s of September 2006 when Bodog Entertainment Group, S.A. effectively ceased operating, it did not have assets to satisfy a $46 Million judgment or $9.3 Million security." (Salas Decl. ¶ 6 (Dkt. No. 8-15 at 5).) The Court is persuaded, based on this evidence, that Plaintiff has a strong likelihood of success on the merits of its claim that BEGSA violated Washington's Fraudulent Transfer Act by transferring the trademarks to GK World with an intent to hinder, delay, or defraud Plaintiff.

Even if the Court was not ultimately persuaded that BEGSA had the requisite intent, Plaintiff has made a showing that it can prove the second method of showing that BEGSA violated the Act:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . .
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (i) Was engaged or was about to engage in a business or a transaction for which

---

[8]The trademark assignment form for the transfer of the marks between BEGSA and GK World shows that the transfer was executed on December 28, 2007. (Dkt. No. 8-10 at 1.) The document also states that the effective date was over a year earlier, September 29, 2006. (*Id.*)

> the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

WASH. REV. CODE § 19.40.041(a). Plaintiff submitted evidence that GK World paid only ten dollars for the assignment, which Plaintiff argues was not a "reasonably equivalent value in exchange for the transfer." (Confirmation of Trademark Assignment (Dkt. No. 8-10 at 3).) Plaintiff submits the Declaration of Scott Lewis, the CEO of 1st Technology, LLC, who estimates that the marks are worth millions of dollars apiece. (Lewis Decl. ¶ 12 (Dkt. No. 9 at 5).) Although Defendants object to this self-serving statement (Dkt. No. 29 at 7), the Court finds it likely that the marks were and continue to be worth far more than ten dollars, given the parties' extensive litigation over them. In addition, in a September 2007 filing before the King County Superior Court, BEGSA acknowledged that the BODOG trademark was "valuable." (Defs.' Mot. For Relief from Enforcement of Pl.'s Writ of Execution 2 (Dkt. No. 34-3 at 2).) As discussed above, Plaintiff has presented evidence that BEGSA was insolvent at the time of the transfer. Accordingly, the Court finds that Plaintiff has a strong likelihood of success on the merits also under the alternate basis for finding that BEGSA violated Washington's Fraudulent Transfer Act.

**2. Whether the Court May Order the Marks Liquidated to Satisfy the Judgment**

Defendants argue that, even if Plaintiff could prove that Defendants violated the Washington Fraudulent Transfer Act, the ultimate relief Plaintiff seeks in this action—the judicially forced sale of the trademarks to satisfy Plaintiff's judgment—is unavailable because "trademarks themselves cannot be the subject of judicial sale or attachment to execute upon a judgment." (Resp. 10 (Dkt. No. 27 at 11).)

The Court is not persuaded at this stage by Defendants' argument. The Court recognizes that a trademark "has no existence apart from the good will of the product or service it symbolizes. Good will of a business and its symbol, a trademark, are inseparable." 1 J. THOMAS MCCARTHY, MCCARTHY ON

TRADEMARKS & UNFAIR COMPETITION § 2:15 (2008). Accordingly, "[i]t is true that a trademark is not a property right in gross which may be sold apart from the business or goodwill with which the trademark has been associated." *Adams Apple Distrib. Co. v. Papeleras Reunidas, S.A.*, 773 F.2d 925, 931 (7th Cir. 1985). However, the "assertion that a trademark is not subject to an involuntary judicial sale is incorrect." *Id.* (explaining that "a trademark is an asset of a bankrupt's estate which is saleable in bankruptcy proceedings along with the bankrupt's goodwill or tangible business assets"). Plaintiff explains that having a judicial sale of the marks along with the goodwill represented by the marks is:

> precisely what [Plaintiff] seeks to accomplish in this case. The principal goodwill representing the Bodog business would constitute the Domain Names and websites through which Bodog's internet-based business is conducted, and Bodog's customer lists. Defendants themselves admitted this in their September 2007 filings in front of Judge Erlick [in the King County Superior Court action]. . . . Judge Erlick already has appointed a receiver to administer the various Domain Names, and this should, as Defendants themselves admitted in front of Judge Erlick, constitute a significant portion of the goodwill of Defendants' business. Once this Court authorizes an appointment of a receiver over the Marks (preferably Mr. Northrup, the Receiver in the King County Superior Court proceeding, who is familiar with the facts of the case and the Domain Names), even assuming Defendants are correct that marks and goodwill must be transferred together, there is no impediment to a combined sale of the Marks and goodwill in this case.

(Reply 6 (Dkt. No. 33).) The Court finds this argument persuasive. BEGSA explained to the King County Superior Court that BEGSA:

> provides online entertainment services. The bulk of Bodog's business is conducted on the Internet via domain names registered to Bodog, including <<bodog.com>>, <<bodog.net>>, and <<bodogmusic.com>> (the "Bodog Domains"). Bodog offers services under the BODOG trademark, and has accumulated substantial goodwill in both the BODOG trademark and Bodog Domains[.] . . . The value of any Internet business, especially one in the consumer entertainment field like Bodog, is necessarily linked to whether it has a recognizable, familiar location on the Internet, and whether consumers recognize a trademark as identifying a single source for services. Bodog has spent years developing its relationship with online consumers and has accrued a substantial amount of goodwill tied to its trademark and the Bodog Domains. Consumers know to navigate to the Bodog Domains to find Bodog's services. *If the domain names are not promptly returned to Bodog, then it will forever lose all of the goodwill established in the Bodog Domains and trademark.*

(Defs.' Mot. For Relief From Enforcement of Pl.'s Writ of Execution 1–2, 5 (Dkt. No. 34-3) (emphasis added).) As described by BEGSA, then, all of the goodwill associated with the BODOG trademark is

linked to the Bodog domain names. The King County Superior Court has already appointed a receiver to liquidate those domain names to satisfy Plaintiff's judgment against BEGSA. Accordingly, this Court finds that Plaintiff has a probable chance of success on the merits of the issue of the Court's power to appoint a receiver to liquidate the marks in conjunction with the state court receiver's liquidation of what is essentially the marks' goodwill, the domain names.

**3. Preemption**

Defendants also argue that "federal trademark law makes no allowance for the reversal of a valid trademark assignment on the grounds of a fraudulent transfer, and in fact, preempts state fraudulent transfer law." (Resp. 16 (Dkt. No. 27 at 17).) In support of this argument, Defendants argue that on its face, the Lanham Act, which governs trademarks, does not provide for the reversal of a trademark assignment based on the fact that it is a fraudulent transfer. (*Id*. at 17.) Defendants argue that Congress left no room for state law to govern the ownership of a federally registered trademark. (*Id*.)

"Federal preemption can be either express or implied." *Chicanos Por La Causa, Inc. v. Napolitano*, __ F.3d __, 2008 WL 4225536, at *4 (9th Cir. Sept. 17, 2008). Defendants argue that a type of implied preemption, field preemption, applies here. Field preemption refers to the doctrine in which "Congress' intent to supercede state law altogether may be inferred because '[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it[.]'" *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Defendants argue that the Lanham Act provides procedures for assigning trademarks, and none of those procedures include reversing a fraudulent transaction. (Resp. 17 (Dkt. No. 27 at 18).) Defendants also point to the Act's language stating that "[n]o State . . . may require alteration of a registered mark" as an indication that Congress intended to preempt state law in this area. 15 U.S.C. § 1121(b).

For the purposes of the instant motion, the Court is not persuaded by Defendants' arguments. This Court has authority to undo the trademark assignments to GK World and Bodog IP or otherwise

rule with respect to the ownership of the trademarks pursuant to 15 U.S.C. § 1119, under which the Court:

> may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. § 1119. Defendants have cited no cases holding that federal trademark law preempts state fraudulent transfer laws. In addition, as Plaintiff has highlighted, at least one other federal district court has, albeit in the context of deciding a motion for default judgment, ruled that where a trademark was transferred fraudulently as to another party, that party was entitled to an order voiding the fraudulent transfer pursuant to both 15 U.S.C. § 1119 and the Iowa Uniform Fraudulent Transfer Act. *See Panda Invs., Inc. v. Jabez Enters. Ltd.*, No. 07-CV-114-LRR, 2007 WL 4556785, at *5 (N.D. Iowa Dec. 20, 2007). Plaintiff has also identified at least one other case in which a federal district court has looked to state law to determine ownership over trademarks. *See Sonista, Inc. v. Hsieh*, 348 F. Supp. 2d 1089, 1093 (N.D. Cal. 2004) (citing California's corporations code in determining whether the president of a company was authorized to sell a trademark, and finding that because he likely was not so authorized, the transfer of the mark was invalid and voidable).

The Court is not persuaded at this stage that preemption bars Plaintiff's ultimate success on the merits.

**B. Irreparable Harm**

Plaintiff argues that it will potentially suffer irreparable harm if Defendants transfer the marks to another offshore entity. (Mot. 15 (Dkt. No. 7 at 19).) Based on their past behavior, Plaintiff argues, Defendants can be expected to further transfer the marks to stymie collections efforts. (*Id.*) In addition, Plaintiff argues that it will suffer irreparable harm if Defendants are permitted to continue offering on-line gambling services to customers in connection with the trademarks, because such services are illegal and the trademarks will thereby be tarnished and their value diminished. Plaintiff contrasts the great harm it

faces with what it characterizes as a lack of potential harm to Defendants in having to comply with the injunction. Plaintiff argues that:

> Defendants cannot argue that they intend to further transfer the Marks—without admitting to the Court that they are engaged in further transfers to frustrate 1st Technology's collections efforts. Similarly, Defendants cannot argue that they will be irreparably harmed by being prevented from using the Marks in connection with online gambling in the United States and in the State of Washington.

(Mot. 16 (Dkt. No. 7 at 20).)

The Court will address each of these arguments in turn, below.

**1. Further Transfer of the Trademarks**

The Court is persuaded that Plaintiff may be irreparably harmed if, during the pendency of this litigation, Defendants further engage in the transfer of the trademarks to other entities not part of this lawsuit, because Plaintiff may thereby be perpetually thwarted in its attempts to collect on its judgment. Further, the balance of harms tips sharply in Plaintiff's favor with regard to this request. While the potential harm to Plaintiff in not issuing the injunction is clear, Defendants have not articulated any potential harm in being enjoined from further transferring the marks.

**2. On-line Gambling Services**

The Court, however, is not persuaded at this time that it should issue an injunction enjoining Defendants from utilizing the trademarks in connection with on-line gambling services in the United States. Plaintiff points to federal and state laws prohibiting the funding of or facilitation of illegal internet gambling, *see* 31 U.S.C. § 5361 and WASH. REV. CODE § 9.46.240,[9] and asserts that "there is no dispute that the services marketed under the Marks—*i.e.*, internet sites like bodoglife.com where end users can

---

[9]Washington law provides that:

> Whoever knowingly transmits or receives gambling information by telephone, . . . the internet, . . . or similar means, or knowingly installs or maintains equipment for the transmission or receipt of gambling information shall be guilty of a class C felony[.]

WASH. REV. CODE § 9.46.240.

gamble with money—are available in the state of Washington to its residents." (Mot. 14 (Dkt. No. 7 at 18).) Plaintiff argues that the use of the trademarks in association with illegal gambling will tarnish the marks and reduce their value. (*Id*.)

Defendants strenuously argue that it is Defendants who will be irreparably harmed if the injunction issues as requested, broadly enjoining Defendants from using the trademarks "in connection with on-line gambling services in the United States, including in the State of Washington." (Proposed Order 2 (Dkt. No. 7-2).) Defendants argue that the marks are used in connection with online gaming that does not involve the wagering of money, and that the "trademarks' only value lies in their past and current usage; their collective value would rapidly drop if an injunction were issued to prevent or limit their usage." (Resp. 21 (Dkt. No. 27 at 22).)

Plaintiff has submitted evidence that the United States government recently filed a civil forfeiture claim in the United States District Court for the District of Maryland to seize over $9 million held for the benefit of bodog.com. (Verified Compl. For Forfeiture (Dkt. No. 34-2 at 1–28).) In the affidavit in support of the seizure warrants, the Special Agent of the Internal Revenue Service, Criminal Investigation Division, swore that:

> Since approximately 2006, I have been investigating the operations of an Internet gambling website called Bodog.com ("Bodog"). Bodog is owned and operated by Calvin Ayre, a citizen of Canada now living in Costa Rica. The physical infrastructure of Bodog is located variously in Vancouver, B.C., the Kahnawake Mohawk Reserve in Canada, and Costa Rica. However, Bodog operates extensively in the United States taking bets from U.S. gamblers over the phone and via the Internet. I know that Bodog.com is now known as Bodoglife.com[.]

(Affidavit in Support of Seizure Warrants 1 (Dkt. No. 34-2 at 9).) According to the affidavit, "millions of dollars, believed to be gambling business proceeds from Bodog, are transferred and distributed to recipients, believed to be gamblers, throughout the United States" in violation of federal and state laws. (*Id*. at 2.)

While the Court is concerned that Defendants may be using the marks in connection with illegal gambling activity, and that, arguably, such conduct could reduce the value of the marks, the Court is not

at this time prepared to distinguish which of Defendants' activities are legal and which are outside the bounds of federal and state law. Defendants argue that "disjoining the marks from their most commonly known use hopelessly dilutes them and destroys their value—to anyone." (*Id.* at 22.) Certainly, Defendants have no right to continue utilizing the marks in conformity with any current or past illegal usage; however, the parties have not fully briefed the issue of how the Court might narrow the scope of the injunction to enjoin only the use of the marks in connection with actually illegal activity. The potential harm to Defendants, and perhaps even to Plaintiff, if the Court prevents Defendants from using the marks in connection with legal activity is great; it "could potentially cause the marks to cease being associated with their intended product[,]" which could diminish the value of the marks. (*Id.*) Accordingly, the Court is not persuaded to issue an injunction with regard to this issue at this time.

**C. Bond**

The Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined[.]" FED. R. CIV. P. 65(c). Plaintiff argues that the bond should be set at zero because "Defendants will not suffer any *legitimate* damages as a result of" the injunction. (Mot. 23 (Dkt. No. 7 at 27) (emphasis in original).) Defendants offer no argument or evidence on this issue.

"The district court is afforded wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (citing *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999); *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000)) (holding that where the party opposing the injunction failed to request a bond or submit any evidence regarding likely damages, the district court committed no error in not requiring the moving party to post a bond in connection with the injunction). The Court finds no evidence that Defendants will suffer damages from being enjoined from further transfer of the trademarks. Accordingly, the Court sets the bond at zero.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART and DENIES IN PART Plaintiff's motion for a preliminary injunction (Dkt. No. 7). Specifically, the Court rules that:

(1) Defendants, their attorneys, agents, or any third parties acting in concert with them, are enjoined from transferring, licensing, encumbering or otherwise disposing of the following trademarks: "BODOG," "BODOG BATTLE OF THE BANDS," "BODOG GIRLS," "and "PLAY HARD" (the "Marks");

(2) The Court sets the bond at zero; and

(3) Plaintiff's motion for a preliminary injunction is denied in all other respects.

SO ORDERED this 30th day of September, 2008.

John C. Coughenour
UNITED STATES DISTRICT JUDGE